UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CIVIL ACTION NO. 66-12071** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **LINCOLN PARISH SCHOOL BOARD, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

Pending before the Court are the Motion and Amended Motion to Transfer the Laboratory Schools (Grambling High School, Grambling Middle School, and the Alma Brown Elementary School) to the Grambling High Foundation and to Place Control and Governance of the School with the Foundation ("Motion to Transfer") [Doc. Nos. 157 & 170] filed by Grambling State University "GSU") and the Board of Supervisors of the University of Louisiana System ("ULS"). Plaintiff the United States of America (the "United States") and Defendant Lincoln Parish School Board (the "Board") filed responses to the Motion to Transfer. [Doc. Nos. 188 & 200].

A hearing was held in this matter on April 21, 2016, at which time the United States and GSU presented testimony and evidence in support of their respective positions. The Board did not present evidence or testimony, but questioned witnesses. Counsel for the Louisiana Board of Elementary and Secondary Education ("BESE"), the Board of Regents, and the Superintendent of Education ("the State Defendants") was also present, but did not actively participate in the hearing.[1] Based on the arguments contained in the Motion to Transfer, as well as the oral arguments of

---

[1] Although the Motion to Transfer was brought by GSU and ULS, GSU presented the case at the hearing. Counsel for ULS, who also serves as counsel for the other State Defendants, observed at the hearing and offered guidance to the Court in a conference following the hearing.

counsel, GSU moves the Court for three alternative remedies: (1) that GSU be authorized to close the Laboratory Schools, (2) that GSU be authorized to transfer control and governance of the Laboratory Schools to the Grambling High Foundation ("GHF") for its operation of a Type 2 charter school at the site of the Laboratory Schools free of any desegregation order or obligations currently placed upon GSU, or (3) that GSU be authorized to transfer control and governance of the Laboratory Schools to the GHF with desegregation obligations.

The Court having fully considered the evidence and testimony presented, and, in light of its own knowledge of this case, finds that GSU's Motion to Transfer should be GRANTED IN PART and DENIED IN PART. The motion is GRANTED to the extent that GSU seeks authorization to either (1) close the Laboratory Schools at the end of the 2015-2016 school year or (2) transfer control and governance of the Laboratory Schools to GHF for operation of a Type 2 charter school at the site of the Laboratory Schools subject to GSU's desegregation obligations. The motion is otherwise DENIED.

## I. PROCEDURAL HISTORY

This desegregation lawsuit was initiated by the United States in 1966. The Court has issued several orders since that time designed to eliminate all vestiges of the prior dual system of schools. In July 1977, the United States filed a motion to desegregate the Grambling Laboratory Schools and A.E. Phillips Laboratory School ("AEP"), which is located on Louisiana Tech University's ("Tech") campus.

In 1979, the United States Court of Appeals for the Fifth Circuit ruled that the addition of GSU, Tech, and the State Defendants to the Lincoln Parish desegregation case was appropriate because "an independent determination that the laboratory schools should be desegregated will surely affect any ongoing litigation under [the School Board's] consent decree." *Copeland v.*

*Lincoln Parish Sch. Bd.*, 598 F.2d 977, 982 (5th Cir. 1979).

On remand, the Court added GSU, Tech, and the State Defendants as parties.

In 1984, this Court approved a consent decree which required GSU to take a number of actions intended to desegregate the Laboratory Schools. [Doc. 82-3]. Specifically, GSU was required to (1) institute community and business outreach initiatives; (2) expand its curricular offerings; (3) expand its "all-day" kindergarten program; (4) hold a summer school program offering both remedial and enrichment courses; (5) engage in affirmative efforts to recruit white students and faculty; (6) provide unique extracurricular offerings; (7) cooperate with the staff of AEP and the School Board to implement the desegregation plan, including reciprocal admissions referrals with AEP; and (8) file annual court reports detailing its progress toward desegregating.

After many years in which this case was largely inactive, in 2009, the Court directed the United States to conduct a unitary status review, which included a review of remaining issues with GSU's and Tech's laboratory schools. That review resulted in a Motion for Further Relief [Doc. Nos. 82, 82-1] being filed by the United States. GSU and Tech opposed the motion and moved on their own for declarations of unitary status. [Doc. Nos. 97, 98, 104 & 105]. Two State Defendants and the School Board supported the position of GSU and Tech.

In September 2013, the Court held a conference with counsel during which the parties agreed to enter into negotiations in an attempt to resolve the lab school issues.

On January 6, 2014, counsel for the parties met to discuss the proposals to resolve the outstanding desegregation issues at the laboratory schools. They met again on March 10, 2014, for further negotiations. At that meeting, GSU's counsel informed the Court and the parties that, in conjunction with the GHF, it had filed an application to convert its lab schools to a charter school. As the parties had not reached agreement and in light of the charter school filing, the instant motion

followed.

## II.  FACTS

The Laboratory Schools are comprised of three schools: Alma J. Brown Elementary School (K-5) ("Alma J. Brown"), Grambling Middle School (6-8) ("GMS"), and Grambling High School (9-12) ("GHS"). The Laboratory Schools have educated students and served the Grambling community for over one hundred years, having been established under the prior dual system. However, student population has declined, and the schools are performing poorly. In addition, the facilities are in poor condition and need significant improvements.

Currently, the Laboratory Schools are funded in three ways: (1) student tuition; (2) State Minimum Foundation Program ("MFP") funding which is received through the School Board, which serves as the schools' fiscal agent; and (3) subsidies or contributions from GSU of approximately $500,000-$700,000 per year. Even with the subsidies and donations, the Laboratory Schools have not been able to fund maintenance, and ULS has denied a request for capital improvement at the Laboratory Schools.

Over the past eight (8) years GSU, like other institutions of higher learning, has suffered significant reductions in the amount of money appropriated to it by the State of Louisiana. In 2008, the state appropriations to GSU constituted 54% of its operating budget. Now, state appropriations constitute only 30% of the operating budget.

This year GSU will receive $15 million in appropriations. Mandated costs must be paid first (e.g. $1.8 million in retirement benefits for employees). GSU then allocates the remaining amount on a percentage basis. The bulk of the remaining appropriations goes to academics. According to the undisputed evidence, these significant reductions in funding have it made it impractical, if not impossible, for GSU to continue to subsidize the budgets of the Laboratory Schools, and, despite

efforts, no other funding has been secured.

In an effort to continue the operation of the Laboratory Schools, GSU collaborated with the GHF, a non-profit corporation established in 2007.[2] With GSU's support and cooperation, GHF filed an application to BESE to convert the three Laboratory Schools to a Type 2 Charter School for K-12 education.[3] The application requested the operation to commence for the 2016-17 school year. In August 2015, BESE conditionally approved the application thus granting a Charter to the Foundation for the operation of Grambling Laboratory Schools as the Grambling Charter Schools through GHF.

GSU and ULS support the establishment of the Charter School, so that GSU could relieve its financial burden, but the school tradition could continue. Additionally, as a Type 2 Charter School, GHF would received increased public funding. In addition to the MFP monies, it would also receive the local dedicated tax funds as well. With increased revenue, GHF anticipates that it can make improvements to the Laboratory Schools and hire highly qualified and certified teachers. GHF has not developed a complete plan to address efforts to recruit minority (white) students. At this point, the focus of GHF's executive director, Gordon Ford, has been on the improving the facilities and academics if GHF is allowed to operate. The United States' expert, Dr. Clair Smrekar, pointed out the weaknesses in the plan and suggested a number of ways that GHF could target minority students.

---

[2] As currently constituted, the GHF's board of directors consists of seven board members. Six of the seven board members graduated from GSU. The record does not indicate any white board members.

[3] GHF had previously filed applications for a charter which were not approved.

**III.    LAW AND ANALYSIS**

Consent decrees are both contracts and enforceable legal orders. *United States v. Alcoa, Inc.*, 533 F.3d 278, 283, 286. As these judicial acts that take "'on the nature of a judgment,'" Federal Rule of Civil Procedure 60(b) governs relief from the judgment. *Williams v. Edwards*, 87 F.3d 126, 130-131 (5th Cir. 1996) (quoting *Ho v. Martin Marietta Corp.*, 845 F.2d 545, 547 (5th Cir. 1988)). A court may modify or vacate a consent decree only if "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable," FED. R. CIV. P. 60(b)(5), or for "any other reason that justifies relief." FED. R. CIV. P. 60(b)(6).

A court has discretion to modify a decree if "significant changes in factual conditions make a consent judgment unworkable, make compliance substantially more onerous, or make enforcement detrimental to the public interest." *Cooper v. Noble*, 33 F.3d 540, 544 (5th Cir. 1994) (citing *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384-85 (1992)). If the moving party meets this burden, then the reviewing court must consider whether "the proposed modification is suitably tailored to the changed circumstance." *See Rufo*, 505 U.S. at 383. To be "suitably tailored," a proposed modification "must not create or perpetuate a constitutional violation." *Id.* at 391.

In this case, the evidence is undisputed that, in the years following the 1984 Consent Decree and particularly in recent years, GSU has lost substantial funding from the State which it must now recover through self-generated income, namely tuition. This change in funding has resulted in budgetary cuts which have not permitted the type of expenditures necessary to improve the Laboratory Schools' facilities, to invest in programs or to take actions necessary to make the schools both higher performing and attractive to parents. The Court concludes that GSU has suffered significant changes in its financial condition which have resulted in making compliance with the

1984 Consent Decree substantially more onerous, if not entirely unworkable.

Under these circumstances, the Court finds that two of the three options proposed by GSU and ULS are viable modifications which appear to be suitably tailored to the changed circumstances. First, the Court will authorize GSU and ULS to close the laboratory schools. GSU's request was not opposed by the United States, the School Board, or the other Defendants. Everyone agrees that the closure of three one-race schools in Lincoln Parish will serve the goals of desegregation by placing those children into the School Board's system. Thus, to this extent, GSU and ULS' Motion to Transfer is GRANTED.

Second, the Court finds that GSU and ULS have offered one other potentially viable option. The goals of desegregation may be met if the control and governance of the Laboratory Schools are placed with GHF, but only if GHF accepts GSU's desegregation obligations.[4] As a Type 2 charter school, GHF is able to obtain significantly more funding from the State. The testimony of the director, Ford, also indicates that GHF has a good opportunity to apply for grants and benefits not available to GSU. While this testimony alone supports GSU's contention that the schools would be better off in the hands of GHF, it is not sufficient to establish that the schools themselves might be approved. Rather, the transfer to GHF must also serve the goals of desegregation.

As the United States' expert witnesses pointed out at the hearing, GHF faces substantial hurdles in taking the actions necessary to attract and retain white students, so that the schools can

---

[4]The United States opposed the transfer of control to GHF without desegregation obligations. It could only agree to transfer of control of GHF with desegregation obligations if GHF and GSU have a plan in place to desegregate the Laboratory Schools.

The School Board took the position that if the Court allowed the transfer of control to GHF, the School Board would no longer have any obligations for the Laboratory Schools, whether or not they had desegregation obligations because GHF has a Type 2 charter.

truly be desegregated. Given the history of the Laboratory Schools and the opportunities available to students on a college campus, the Court believes it appropriate to give GHF a chance to assume the desegregation obligations and open as a charter school, but only with the following additional requirements:

    (1)    GHF will enroll in this matter immediately;

    (2)    GSU, while no longer operating the Laboratory Schools, will remain a party to this action to facilitate the transfer and to assist the Court with any issues that may arise with the charter school; and

    (3)    GHF and GSU will work with the United States to develop a new consent decree to replace the 1984 Consent Decree and to develop a plan which is reasonably calculated to address the goals of desegregation and to allow the new charter school to obtain unitary status.

The Court will hold a telephone status conference on May 4, 2016, at 1:00 p.m., to discuss the progress that GSU, GHF, and the United States have made towards reaching a new consent decree or if they have been unable to make progress. Additionally, it is the intent of the Court that the parties file a new proposed consent decree by May 9, 2016, so that the GHF can move forward with preparations for the 2016-2017 school year.

## IV.    CONCLUSION

For the foregoing reasons, GSU and ULS' Motion to Transfer [Doc. Nos. 157 & 170] are GRANTED IN PART and DENIED IN PART. To the extent that GSU and ULS move for authorization to close the Laboratory Schools, the motion is GRANTED. To the extent that they move for authorization to transfer control and governance of the Laboratory Schools to GHF, the motion is also GRANTED, but only if GHF does so subject to GSU's desegregation obligations and

under the other conditions detailed in this Ruling.  The motion is otherwise DENIED.

**MONROE, LOUISIANA**, this 25th day of April, 2016.

_____
**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**