UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CIVIL ACTION NO. 66-12071 |
| VERSUS | JUDGE ROBERT G. JAMES |
| LINCOLN PARISH SCHOOL BOARD, ET AL. | MAG. JUDGE KAREN L. HAYES |

WRITTEN REASONS FOR RULING ON ORAL MOTION

On August 2, 2016, the Court granted the emergency oral motion of Grambling High Foundation ("GHF") authorizing the opening of a charter school in the former laboratory school facilities for the 2016-2017 school year.  At that time, the Court stated the bases and conditions of its ruling, but stated that written reasons would be filed in the record shortly.  These written reasons now issue.

I.    FACTS AND PROCEDURAL HISTORY

This school desegregation case has been pending for fifty years.  The Lincoln Parish School Board ("the School Board") currently operates under a desegregation plan and decree entered on August 1, 1969, and modified multiple times over the years. Pursuant to the latest modification, on June 2, 2015 [Doc. No. 151], the only remaining *Green* factor of student assignment was addressed by a supplemental consent decree.  Under that decree, it is anticipated that the case will be finally resolved at the end of the year.[1]

---

[1]Under the current consent decree, the School Board may move for a declaration of unitary status sixty (60) days after the submission of its October 15, 2016 status report, and the United States will not oppose unitary status if the School Board has complied with the provisions of the decree.  As of this date, the Court has not been informed of any compliance issues which would result in the United States' opposition to a unitary status finding.

However, in addition to the schools operated by the School Board, two laboratory schools have educated students in the District since their founding in the early 1900s.  On the campus of Grambling State University ("GSU"), a historically black college, students have been educated at a laboratory school known as the Alma J. Brown Elementary School (grades K-5), Grambling Middle School (grades 6-8), and Grambling High School (grades 9-12) (collectively "Grambling Laboratory Schools").  On the campus of Louisiana Tech University ("Tech"), a formerly *de jure* white university, students in grades K-8 are educated at the A.E. Phillips Laboratory School ("AEP").  The Grambling and AEP laboratory schools have been racially identifiable since their opening.  However, they were not originally part of this case.

In July 1977, the United States filed a motion to desegregate the laboratory schools.

In 1979, the United States Court of Appeals for the Fifth Circuit ruled that the addition of GSU, Tech, and certain State Defendants[2] to this case was appropriate because "an independent determination that the laboratory schools should be desegregated will surely affect any ongoing litigation under [the School Board's] consent decree."  *Copeland v. Lincoln Parish Sch. Bd.*, 598 F.2d 977, 982 (5th Cir. 1979).

On remand, the Court added GSU, Tech, and the State Defendants as parties.

In 1984, this Court approved a consent decree to desegregate the two laboratory schools.

Between 1984 and 2009, GSU filed no reports on behalf of the lab school despite the requirement that it do so, nor did it comply with other provisions of the 1984 consent decree.  The United States did not move the Court for a finding of contempt or take any other action to enforce

_____

[2]In 2013, the docket sheet was corrected to reflect the proper State Defendants as the Louisiana Board of Elementary and Secondary Education ("BESE"), the President of Tech, the President of GSU, and the Superintendent of Education. [Doc. No. 112].

the consent decree's provisions.[3]

After many years of inactivity, on December 14, 2009, the Court held a status conference in this case and directed the United States to conduct a unitary status review of the schools operated by the School Board, as well as GSU's and Tech's laboratory schools.  That review resulted in a Motion for Further Relief [Doc. Nos. 82, 82-1] being filed by the United States.  GSU and Tech opposed the motion and moved on their own for declarations of unitary status. [Doc. Nos. 97, 98, 104 & 105].  Two State Defendants and the School Board supported the position of GSU and Tech.

In September 2013, the Court held a conference with counsel during which the parties agreed to enter into negotiations in an attempt to resolve the lab school issues.

On January 6, 2014, counsel for the parties met to discuss the proposals to resolve the outstanding desegregation issues at the laboratory schools.  They met again on March 10, 2014, for further negotiations. At that meeting, GSU's counsel informed the Court and the parties that, in conjunction with GHF, it had filed an application to convert its laboratory school to a charter school.

On October 15, 2015, GSU filed a Motion to Transfer the Grambling Laboratory Schools to GHF.  On January 26, 2016, GSU filed an Amended Motion to Transfer.  The United States  and the School Board responded to these motions.

A hearing was held on GSU's motions on April 21, 2016.  During that hearing, the Court heard testimony from the United States' witnesses, Dr. Claire Smrekar, an expert in school desegregation, school choice, and parents' school choice migration, and J. Frank Brewer, an expert in school facilities.  The Court also heard testimony from GSU's witnesses, who testified about the

_____

[3]The School Board had continued to file annual reports, but AEP had not filed reports since 1992.

historical and current state of the Grambling Laboratory Schools, as well as from Gordan Ford ("Ford"), the director of GHF, who testified about the anticipated charter school and the benefits of such a school over the existing laboratory school.  After fully considering the evidence and testimony presented, and, in light of its own knowledge of this case, the Court granted the motions in part and denied them in part. [Doc. No. 211].  To the extent that  GSU sought authorization to either (1) close the laboratory school at the end of the 2015-2016 school year or (2) transfer control and governance of the laboratory schools to GHF  for operation of a Type 2 charter school at the site of the laboratory schools subject to GSU's desegregation obligations, the Court granted the motions.  The motions were otherwise denied.

In ruling, the Court made the following findings:

In this case, the evidence is undisputed that, in the years following the 1984 Consent Decree and particularly in recent years, GSU has lost substantial funding from the State which it must now recover through self-generated income, namely tuition. This change in funding has resulted in budgetary cuts which have not permitted the type of expenditures necessary to improve the Laboratory Schools' facilities, to invest in programs or to take actions necessary to make the schools both higher performing and attractive to parents.  The Court concludes that GSU has suffered significant changes in its financial condition which have resulted in making compliance with the 1984 Consent Decree substantially more onerous, if not entirely unworkable.

Under these circumstances, the Court finds that two of the three options proposed by GSU and ULS are viable modifications which appear to be suitably tailored to the changed circumstances.  First, the Court will authorize GSU and ULS to close the laboratory schools. GSU's request was not opposed by the United States, the School Board, or the other Defendants. Everyone agrees that the closure of three one-race schools in Lincoln Parish will serve the goals of desegregation by placing those children into the School Board's system.[4] Thus, to this extent, GSU and ULS' Motion to Transfer is GRANTED.

---

[4]The Court would note, however, that a review of the student demographics for Lincoln Parish shows that a return of black students from the Grambling Laboratory Schools to that District will have a minimal statistical effect.  *See* [Doc. No. 155].  Additionally, all of the students do not reside, and thus would not return to school, in that District.

Second, the Court finds that GSU and ULS have offered one other potentially viable option. The goals of desegregation may be met if the control and governance of the Laboratory Schools are placed with GHF, but only if GHF accepts GSU's desegregation obligations. . . .   As a Type 2 charter school, GHF is able to obtain significantly more funding from the State. The testimony of the director, Ford, also indicates that GHF has a good opportunity to apply for grants and benefits not available to GSU. While this testimony alone supports GSU's contention that the schools would be better off in the hands of GHF, it is not sufficient to establish that the schools themselves might be approved. Rather, the transfer to GHF must also serve the goals of desegregation.

As the United States' expert witnesses pointed out at the hearing, GHF faces substantial hurdles in taking the actions necessary to attract and retain white students, so that the schools can truly be desegregated.  Given the history of the Laboratory Schools and the opportunities available to students on a college campus, the Court believes it appropriate to give GHF a chance to assume the desegregation obligations and open as a charter school, but only with the following additional requirements:

    (1)    GHF will enroll in this matter immediately;

    (2)    GSU, while no longer operating the Laboratory Schools, will remain a party to this action to facilitate the transfer and to assist the Court with any issues that may arise with the charter school; and

    (3)    GHF and GSU will work with the United States to develop a new consent decree to replace the 1984 Consent Decree and to develop a plan which is reasonably calculated to address the goals of desegregation and to allow the new charter school to obtain unitary status.

[Doc. No. 211, pp. 7-8].

Following the Court's Ruling on GSU's motions, counsel for the United States and GHF began working together on a new consent decree and plan for the operation of the charter school that would address the goals of desegregation.

On May 4, 2016, GHF moved to intervene in this matter.  However, the United States raised objections to the language of the proposed order.  Accordingly, the Court instructed counsel for the

United States and GHF to work together to resolve this additional issue.

On July 7, 2016, GSU filed an Emergency Motion for Settlement Conference [Doc. No. 217]. In the motion, GSU and GHF stated that they had "reached an impasse [in negotiations with the United States] in that they have been unavailable to agree on certain provisions of the Consent Decree." *Id.* If the charter school were to open, it was necessary for teachers to "report for professional development in late July and the first day of class occurs in early August." *Id.* Thus, GSU and GHF alleged that "the only way the charter school will open is for the Court to intervene and help breach the impasse reached in the negotiation of a Consent Decree." *Id.*

On July 8, 2016, the Court held a telephone status conference with counsel to discuss the emergency motion, as well as other issues, including the status of the intervention order. At that time, counsel for the United States advised that they did not oppose a settlement conference. The Court notified the parties that it would refer the motion to Magistrate Judge Karen L. Hayes. The Court further advised counsel, however, that no settlement conference would be held unless and until the proposed language of the intervention order was provided to the Court.

On July 19, 2016, the Court held a telephone status conference to address issues with AEP. However, during that conference, counsel for GSU and the United States raised the intervention issue, notifying the Court that, after multiple discussions, they had been unable to agree and asked the Court to consider their separate, proposed orders. [Doc. No. 222].

The same day, the Court granted GHF's intervention  "for the purpose of working with Plaintiff United States of America to draft a consent decree that includes a plan for the transfer and operation of the proposed charter school which is reasonably calculated to address the goals of desegregation. GHF's acceptance of the transfer and operation of the proposed charter school is

subject to [GSU's] desegregation obligations, and GHF is to operate the proposed charter school consistent with this Court's orders and with all extant and applicable federal laws. [GSU] remains a defendant in this case to facilitate the transfer of operations and to assist the Court with any issues that may arise with the charter school."[5] [Doc. No. 221].

On July 25, 2016, Magistrate Judge Hayes held a telephone conference with counsel. She granted the Emergency Motion for Settlement Conference and set the settlement conference for August 2, 2016.

On August 2, 2016, counsel for the United States, counsel and representatives for GHF, and counsel for BESE were present for a settlement conference with Magistrate Judge Hayes. However, during negotiations that afternoon, the parties reached an impasse on two issues which were key to any consent decree and, ultimately, to the opening of the charter school. At that time, the Court held a conference with counsel to determine what action, if any, it would take.

After some discussion, the Court and counsel re-convened in open court for further proceedings on the record. GHF's counsel made an oral motion for authorization to open the charter school for the 2016-2017 school year. [Doc. No. 227]. Because Lincoln Parish schools are slated to open on August 12, 2016, GHF argued that if no authorization was received on that date, the Court would in effect be making the decision to close the school. In all fairness to the teachers, staff, students, and to the School Board, GHF had to give them notice immediately if the school was not going to open.

The United States opposed the motion. The United States argued that the charter school

---

[5]Although the Order was docketed prior to the minutes of the July 19, 2016 telephone status conference, the Court did not issue the Order until after the conference and after reviewing the two proposed orders.

should not be allowed to open without a fully developed plan that is reasonably calculated to achieve desegregation.  The United States further argued that GHF has failed to provide complete and accurate information which has hampered the ability of the parties to reach a consent decree. To open without further information and evidence was, in the view of the United States, to perpetuate the operation of a one-race school.

The Court found, first, that an expedited hearing was justified and necessary in light of the impending commencement of the school year, the effect on faculty and staff, and, particularly the effect on students.  Although the United States had expressed concern about the sufficiency of the record, the Court found that the record was sufficient in light of the extensive testimony at the April 21, 2016 hearing, including the testimony of the United States' two experts.  The Court then granted authorization to GHF to open the charter school for the 2016-17 school year, setting a baseline of 370 students and further setting a deadline of October 1, 2017, for the filing of a financial commitment letter for the construction of new facilities. Finally, the Court ordered counsel for GHF and the United States to file any consent decree reached on the remaining issues no later than September 6, 2016.  If the parties are unable to reach agreement, the Court ordered them to file separate proposed desegregation plans for the charter school with argument in support thereof. Given the expedited hearing and timeliness, the Court further indicated that it would issue written reasons for its ruling.

## II.    LAW AND ANALYSIS

This case presents a number of issues not typical to a traditional desegregation case. Originally, the school at issue was a State laboratory school, but which (along with AEP) had been found to be racially identifiable and then included in the School Board's desegregation case because

of the possible effect on the District's own desegregation efforts.  The desegregation efforts of the School Board, however, have been resolved, subject to its compliance with the final consent decree on the final area of student assignment.  The United States and AEP have also reached consent generally and are expected to resolve any remaining issues with revisions to the current proposed consent decree before the end of the year.[6]

Now, the Court is presented with a new Type 2 charter school, authorized by the State of Louisiana.  This is not a charter which was a conversion of an existing school to a charter school, but is the creation of a new school which has the right to accept students from any parish.  Nonetheless, neither the parties nor the Court can ignore the fact that this "new" school will operate, at least at first, in the same location as the Grambling Laboratory Schools.  Nor can or does the Court ignore the fact that the Grambling Laboratory Schools were racially identifiable.

Further, Louisiana Revised Statute 17:3991C(3) recognizes that charter schools shall "[b]e subject to any court-ordered desegregation plan in effect for the city or parish school system."  As of this date, the District in which this school is located is under a desegregation plan.

Finally, in its own April 25, 2016 Ruling [Doc. No. 211], the Court found that GHF would only be allowed to operate if it accepted the desegregation obligations of GSU and worked to develop a new consent decree to replace the 1984 Consent Decree and to develop a plan which is reasonably calculated to address the goals of desegregation and to allow the new charter school to obtain unitary status.

_____

[6]The United States and AEP have thirty (30) days to revise the pending proposed consent decree [Doc. No. 171] once this Court rules on the School Board's pending Motion to Dismiss [Doc. No. 102] its obligations with regard to the laboratory schools.  The Court will rule on that motion shortly.

In every desegregation case, the Court's role is limited to whether operation of the public charter school would undermine desegregation and promote resegregation.  This is certainly not the first occasion the Court has had to consider a charter school and the implications for and on desegregation efforts.  In each of those cases, the Court has sought guidance and authority from any other source, and, without fail, the attorneys involved, including the United States, have cited this Court back to its own prior opinions. Further, in other cases, the United States has not sought the closure or the prevention of the operation of a charter school, but that the schools be operated within certain conditions.

In this case, the Parish in which the school will operate is one factor and a few months from achieving unitary status.  It is the Grambling Laboratory Schools that were not.  If those schools had simply closed, no further action would or could be taken by the United States or this Court in this proceeding.  Likewise, if GHF had simply waited until the Grambling Laboratory Schools had closed and then sought a new charter, it could have operated a Type 2 charter school in Lincoln Parish without regard to any prior desegregation orders in the Parish or which pertained to the laboratory schools.[7]   If GHF had taken this route, it would not have had to make any effort to recruit white students, but would have  been subject to the general state law on admittance.  Instead, GHF has taken the more difficult route of trying to open the school in the upcoming year and to work with the United States in establishing a plan which is reasonably calculated to desegregate a school that has always been one race.

The Court finds that counsel for the United States and GHF have worked diligently to

---

[7]This assumes, of course, that the School Board will be granted unitary status in the time contemplated by the current consent decree, but the Court has no information to suggest that it will not.

achieve that goal.  Indeed, counsel for GHF pointed out, and it was not contested by counsel for the United States, that they have agreed to points resulting in a draft plan that is greater than 60 pages at this stage.  The Court does not believe that either party is acting in bad faith.

However, because of the imminent start of the 2016-2017 school year, the Court was faced with the decision whether to authorize the opening of the charter school.  If the Court had denied GHF's motion and required counsel to continue settlement efforts, it was clear and undisputed by both parties that the charter school could not open this year.

On the other hand, if GHF had been able to re-group and obtain another charter application, it would have done so without any desegregation obligation and without any oversight from the United States.  It would simply have applied the typical criteria and would likely be operating a one-race school a year or two in the future.

With these conflicting considerations, the Court carefully considered the evidence and arguments of counsel and authorized the opening of the charter school for the upcoming school year. The Court does not do so without trepidation and, as it advised GHF representatives in open court, with the awareness that GHF faces an uphill battle.  Ultimately, however, the Court found that the parties have reached agreement on a large number of provisions and that any disputed provisions can be resolved, either by agreement or by order, within the next month, which is shortly after school begins.  Under these circumstances, the Court finds that GHF is authorized to open, subject to final resolution by September 6, 2016, of a plan that is reasonably calculated to achieve desegregation of this new charter school.

## III.    CONCLUSION

For the reasons set forth above and stated orally in open court on August 2, 2016, GHF's oral

motion for authorization [Doc. No. 227] was GRANTED.  GHF may begin operation in the 2016-

2017 school year, subject to the following conditions:

(1)    GHF will have a baseline of 370 students;

(2)    GHF will file a letter of financial commitment for the construction of new
       facilities no later than October 1, 2017;

(3)    GHF and the United States will file a proposed consent decree no later than
       September 6, 2016, or, in the alternative, GHF and the United States will file
       separate proposed desegregation plans by that date.

MONROE, LOUISIANA, this 4th day of August, 2016.


ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE